UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

HELEN PITTS, ET AL

VERSUS

BRUCE GREENSTEIN, IN HIS OFFICIAL
CAPACITY AS SECRETARY OF THE
LOUISIANA DEPARTMENT OF HEALTH
AND HOSPITALS, ET AL

CIVIL ACTION

NO. 10-635-JJB-SR

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on Defendants' Motion (doc. 11) for Summary Judgment. Plaintiffs have filed an opposition (doc. 36) to which Defendants have filed a reply (doc. 39). On April 20, 2011, this Court heard oral arguments from the parties. This Court's jurisdiction exists pursuant to 28 U.S.C. § 1331. For the reasons stated herein the Court DENIES Defendants' motion (doc. 11).

## Background

### I. Facts

The following facts are undisputed. Since 2003, the state of Louisiana, as part of its Medicaid plan, has offered home-and-community-based services ("HCBS") to disabled individuals through its long-term personal care services ("LT-PCS") program (doc. 36, ex. 1, pp. 10-11). The LT-PCS program provides disabled individuals with a personal care worker to assist the individual in performing basic tasks, such as personal care or household chores, that the

1

individual would otherwise be unable to perform (doc. 36, ex. 1, pp. 5-8).[1]

Those who do not qualify for LT-PCS, or seek additional or alternative services, may enter one of the State's waiver programs,[2] however, each program suffers from limited slots, geographical or age limits, and/or waiting lists. For those programs that have waiting lists, an individual may be moved to the top of the priority list and immediately offered a waiver, but to do so, the individual must have had a hospital stay in excess of 30 days or been treated in a nursing facility for 120 consecutive days (doc. 39-2, ¶ 13).

In March 2009, in order to address budgetary concerns, the State lowered the maximum weekly LT-PCS service hours that an individual could receive from

---

[1] To qualify for LT-PCS, an individual must be so physically disabled that he or she would qualify to receive care in a nursing facility and must demonstrate that he or she "faces a substantial possibility of deterioration in mental or physical condition or functioning if either home or community-based services are not provided in less than 120 days." 34 LAC 50 XV § 12905, Louisiana Register, v. 30 no. 12 December 2004, p. 2831.
 Plaintiffs Helen Pitts, Kenneth Roman, Denise Hodges, Rickii Ainey and Cleo Lancaster each receive an average of 39 hours per week of care through LT-PCS (doc. 36, ex. 3, ¶ 22; ex. 4, ¶ 20; ex. 5, ¶16; ex. 6, ¶ 28). Each Plaintiff's primary physician has stated that if his or her hours of in-home care are reduced to 32 hours per week, each will suffer a deterioration in condition and will be forced to enter a nursing home for care (doc. 36, ex. 8, ¶¶ 9, 11-15; ex. 9, ¶¶ 11, 13; ex. 10; ex. 11, ¶¶ 8-12; ex 12 ¶¶17-18).

[2] Louisiana maintains the following waiver services:
- Elderly and Disabled Adults ("EDA"): The EDA program, which an individual may not participate in simultaneously with LT-PCS, provides an annual budget which is typically substantial enough to pay for 65 hours of in-home care (doc. 36, ex. 1, pp. 73-74). However, an individual must wait approximately 30 months before receiving the applied-for care (*Id.* p. 52). As of October 10, 2010, 46% of the 12,021 people who received LT-PCS were also on the EDA waiting list (*Id.* p. 69). Moreover, in 2009 the State capped the program at 4,603 slots (*Id.* p. 41).
- Adult Day Health Care ("ADHC"): The ADHC program provides essential services in an adult day care center. All ADHC licensed facilities must operate for a minimum of five hours per day and must provide transportation to and from the facility (doc. 11-2, ¶ 22). However, it has only 825 slots, a waiting list over five months long and is not available in many parts of the state.
- Program of All-Inclusive Care for the Elderly ("PACE"): The PACE program has only 400 slots and is only available to individuals 55 and older and only in certain parts of Baton Rouge and New Orleans (*Id.* p. 43-44).
- Money Follows the Person ("MFP"): The MFP program offers assistance to individuals transitioning from nursing facilities, but does not provide services to individuals seeking to avoid entering a nursing facility (*Id.* at 89-91).

56 to 42 (doc. 36, ex. 1, pp. 11, 66-67). In September 2010, the State again lowered the maximum weekly service hours, from 42 to 32, and changed the assessment criteria (doc. 36, ex. 1, pp. 11, 66-67).[3] These provisions apply not only to new LT-PCS recipients but to individuals currently receiving assistance when they undergo their annual eligibility assessments.

The Louisiana Department of Health and Hospitals ("LADHH") has determined this change will save the state $5 million in 2011 and $24 million in 2012 (doc. 36, ex. 1, p. 206). However, Plaintiffs suggest that the average cost of services for an individual in the LT-PCS program is less than the cost of maintaining the same individual in a nursing home (doc. 36, Pitts_0001041, p. 2). Plaintiffs also suggest that the cost of servicing individuals in nursing homes has steadily increased in recent years (doc. 36, Pitts_000044, Pitts_0001188).

II. Procedu ral History

On September 22, 2010, Plaintiffs filed suit against the LADHH and its Secretary, Bruce Greenstein, seeking declaratory and injunctive relief (doc. 1). Plaintiffs assert that the reduction in LT-PCS hours unlawfully discriminates against disabled individuals by depriving them of at-home assistance necessary

---

[3] As of March 1, 2009, the State determined the level of an individual's disability by the individual's ability to perform (1) seven different "activities of daily living" (ADLs): bed mobility, transferring, locomotion, dressing, eating, toileting, personal hygiene and bathing; (2) eight different "instrumental activities of daily living" (IADLs): meal preparation, housework, managing finances or medication, using the phone, shopping and transportation. In August 2010, the State changed its method of determining the level of an individual's disability to require the individual, in order to receive the maximum amount of assistance, need assistance in four ADLs: eating, bathing, transferring, and moving in bed (doc. 36, ex. 1, 164-172).

Nationally, an individual needing assistance in three ADLs receives an average of 59.6 hours per week of personal assistance in order to remain in the community; an individual needing assistance in four ADLs receives 85.9 (doc. 36).

to remain "integrated" into the community in violation of the Title II of the American's with Disabilities Act ("ADA"), 42 U.S.C. § 12132 (2010), and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a) (2010).

On October 21, 2010, Defendants filed their Motion (doc. 11) to Dismiss Plaintiffs' claims, which the Court later converted (doc. 25) into a Motion for Summary Judgment. Defendants assert that they have not discriminated against Plaintiffs under the ADA or Section 504 because they have a comprehensive and effective plan in place to provide disabled individuals with HCBS. Defendants also assert that even if they have discriminated against Plaintiffs, Plaintiffs' ADA and Section 504 claims must fail because they have failed to meet their burden of providing a reasonable modification to the proposed plan (doc. 11).

On November 10, 2010, Plaintiffs filed their opposition (doc. 17). Plaintiffs assert that Defendants (1) have discriminated against them under the ADA and Section 504 by increasing the likelihood that they will be institutionalized; (2) they have proposed a reasonable modification in suggesting the state maintain its 42-hour maximum; and (3) Defendants have additionally discriminated against Plaintiffs by basing the level of care they receive on the severity of their disability (doc. 17).

## Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6) a federal district court should dismiss a plaintiff's complaint if it "fails to state a claim upon which relief can be granted." However, [i]f, on a motion under Rule 12(b)(6) . . ., matters

4

outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment." Fed. R. Civ. P. 12(d). A court may grant a motion for summary judgment if the evidence establishes that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. If the movant carries its burden, the non-movant must then demonstrate the existence of a genuine issue of material fact in order to survive the motion for summary judgment. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## Discussion

Defendants assert that they have not discriminated under the ADA or Section 504 by reducing the weekly maximum of LT-PCS service hours (doc. 11). Defendants assert that the combination of LT-PCS and waiver programs ensure that disabled individuals are not forced into nursing facilities. Defendants assert that Plaintiffs have failed to show that returning to a 42-hour weekly maximum is a reasonable modification to the current plan.

Plaintiffs assert that the State's plan increases their risk of institutionalization because the State's waiver programs are either unavailable in many parts of the state or have lengthy waiting periods. Plaintiffs also assert that returning to a 42-hour weekly maximum is a reasonable modification because the State will end up spending more money if LT-PCS recipients are forced to receive care in nursing facilities as a result of the reduction. Therefore, Plaintiffs assert, Defendants now bear the burden of establishing that returning to the 42-

hour weekly maximum would constitute an undue burden or a fundamental alteration of its program.

The ADA prohibits state agencies from discriminating against individuals with disabilities in the provision of public services. 42 U.S.C. §§ 12131(A)-(B) & 12132. In drafting the ADA, Congress stated that "historically, society has tended to isolate and segregate individuals with disabilities" and that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, . . . failure to make modifications to existing facilities and practices . . . [and] segregation." 42 U.S.C. §§ 12101(a)(2), (5). To effectuate the goal of integrating disabled individuals into their communities, public entities are required to "administer services . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities" and to make "reasonable modifications" in furtherance of that goal. 28 CFR § 35.130(b)(7), (d) (1998).

The party challenging a State's program bears the initial burden of demonstrating that the program violates the ADA's integration mandate and that the requested relief would be a reasonable modification. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 280 (2d Cir. 2003). A State's program violates the ADA's integration mandate if it creates the *risk* of segregation; neither present nor inevitable segregation is required.[4] In determining whether a proposed

---

[4] For example, in *Fisher v. Oklahoma*, 335 F.3d 1175 (10th Cir. 2003), Oklahoma adopted a policy under which it provided unlimited prescription medicine to individuals in institutions, but not to individuals receiving community-based services. *Fisher*, 335 F.3d at 1181. The Tenth Circuit Court of Appeals

modification is reasonable, courts consider the resources available to the State and the State's responsibility to equitably apportion those resources to all disabled individuals. *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581, 597, 604, 607 (1999). That is, courts must consider the cost-effectiveness of community-based services globally and not solely in relation to the particular litigants. *Olmstead*, 527 U.S. at 604 (stating that although community-based services may be cheaper than institutional services when judged on a purely individual basis, a "[s]tate . . . may experience increased overall expenses by funding community placements without being able to take advantage of the savings associated with closure of institutions"). As such, a State must be given some leeway in complying with the ADA and can satisfy its obligations by "demonstrat[ing] that it [has] a comprehensive, effectively working plan for placing qualified persons with [] disabilities in less restrictive settings, and a waiting list that move[s] at a reasonable pace." *Id.* at 605-06.

The Court finds that Defendants' Motion for Summary Judgment should be denied. Plaintiffs require, on average, 39 hours of HCBS per week (doc. 36, ex. 3, ¶ 22; ex. 4, ¶ 20; ex. 5, ¶16; ex. 6, ¶ 28). Therefore, Louisiana's current plan would require Plaintiffs to receive, on average, 7 hours of additional assistance per week. Though the State has waiver programs through which Plaintiffs can

---

found that this violated Title II because the plaintiffs' health might deteriorate, leading to increased need for prescription medication and, therefore, an increased risk of institutionalization. *Id; see also Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1170 (N.D. Cal. 2009) (stating that the risk of institutionalization is sufficient for a violation of the ADA); *M.A.C. v. Betit*, 284 F. Supp. 2d 1298, 1309 (D. Utah 2003) (same); *Makin v. Hawaii*, 144 F. Supp. 2d 1017, 1034 (D. Haw. 1999) (same).

7

receive the necessary supplemental assistance, each of the programs has limited slots, geographical or age limits, and/or waiting lists of up to two-and-a-half years. *See supra* note 2. Defendants assert that Plaintiffs can be moved to the top of the priority list by submitting to a 120-day stay in a nursing facility, however, this would subject Plaintiffs to the very institutionalization which the ADA seeks to avoid. Therefore, the State's current plan plainly violates the ADA by creating a greater risk for institutionalization for those individuals who require more than 32 hours per week of assistance. *See Fisher*, 335 F.3d at 1181.

In addition, there are genuine issues of material fact as to whether maintaining the 42-hour weekly maximum is a "reasonable modification" or a "fundamental alteration" for purposes of Plaintiffs' ADA claim. Plaintiffs assert that the proposed plan will save the state $5 million in 2011 and $24 million in 2012 (doc. 36, ex. 1, p. 206). However, Defendants assert that the cost of servicing individuals in nursing homes has steadily increased in recent years (doc. 36, Pitts_000044, Pitts_0001188), and that the average cost of serving an individual in the LT-PCS program is less than the cost of maintaining the same individual in a nursing facility (doc. 36, Pitts_0001041, p. 2). Therefore, the Court finds that summary judgment is not appropriate.

## Conclusion

Accordingly, the Court hereby DENIES Defendants' Motion (doc. 11) for Summary Judgment.

Signed in Baton Rouge, Louisiana this 16th day of May, 2011.

_____
JUDGE JAMES. J. BRADY
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA